UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| NATALIA TRAVIS | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. |
| | * | |
| LSU HEALTH SCIENCES CENTER | * | SEC. _ _ MAG. DIV. ( ) |

\* \* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*\* \*

**COMPLAINT—REHABILITATION ACT OF 1973**

I. *PRELIMINARY STATEMENT*

1. The plaintiff, Natalia Travis (Travis) brings this action under Section 504 of the Rehabilitation Act (29 U.S.C. § 794) to redress injury done to her by the defendant's discriminatory treatment on the basis of her disability Myasthenia Gravis, in violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701 et seq. In 1978 Congress amended the Rehabilitation Act of 1973 to provide that the "remedies, procedures and rights" under Title VI of the Civil Rights Act of 1964 should apply to cases brought under Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(a)(2).

II. *JURISDICTION*

2. The jurisdiction of this Court over this controversy is invoked under the provisions of 29 U.S.C. §§ 794 et seq., 28 U.S.C. § 1331, and 28 U.S.C. § 1343(a)(4).

III. *VENUE*

3. The unlawful employment practices alleged below were committed within the Eastern District of the State of Louisiana. Accordingly, venue lies in the United States District Court for the District of Louisiana under 28 U.S.C. § 1391(b).

IV. *PARTIES*

4. The Plaintiff, Natalia Travis, is a citizen of the United States and a resident of the State of Louisiana. Plaintiff has been diagnosed as having Myasthenia Gravis, a chronic autoimmune neuromuscular disorder that is characterized by fluctuating weakness of the voluntary muscle groups. Plaintiff is a "handicapped individual" within the meaning of 29 U.S.C. § 706 (8).

5. The defendant. LSU Health Sciences Center, (hereafter "defendant" or "LSUHSC"), is a recipient of federal financial assistance within the meaning of the Rehabilitation Act through, inter alia, the Medicaid and Medicare programs and thus is covered by Section 704 of the federal Rehabilitation Act of 1973.

V. *STATEMENT OF FACTS*

6. Plaintiff enrolled in LSUHSC's PhD program in August 2016. She disclosed in her PhD application that she has Myasthenia Gravis and was admitted to the program.

7. All of Plaintiff's research involved the parasite *Trypanosoma cruzi*, which is a parasite transmitted by the insect bite of triatomine bugs or via contaminated blood transfusion. There is no skin to skin or airborne transmission of this

parasite. There is limited data for oral transmission, but it would require that someone literally drink the parasites to be contaminated.

8. All of Plaintiff's access to her samples and work with the samples is done in a biosafety cabinet, which provides protection for others, her and the samples by creating negative pressure to keep the air inside the cabinet from contacting the air outside the cabinet. The air inside is tightly controlled and filtered.

9. If a sample to be dropped, it would be completely contained in the biosafety cabinet.

10. Plaintiff had a Myasthenia Gravis crisis which required hospitalization.

11. Plaintiff's principle investigator was Douglas Johnston, PhD (sometimes "Johnston").

12. LSUHSC granted Plaintiff a leave of absence from her doctoral studies effective January 10, 2018. She was fully released by her treating physicians to return to her studies, which she did by August 6, 2018.

13. Upon Plaintiff's return, Dr. Johnston's discriminatory animus was clear. His statements clearly meant to discourage her from remaining in the program include but are not limited to (a) "Why do you want to suffer by coming back to the program?"; (b) mockingly, "You'd be having the same issues if you were 400 lbs. or a drunk. We can't accommodate everything." (c) as Plaintiff was reading research, "You're supposed to be doing that at home, but have five kids, three dogs, two cats and six husbands."

14. Plaintiff worked for a significant time to establish her research samples. When she was granted her leave of absence, her working samples remained untouched at -80 C. There was no rational reason for her to start over, but Dr. Johnson forbade Plaintiff from using her established samples. Although requested, Johnson gave no reasons for this patently unjustified and retaliatory action.

15. Plaintiff's Myasthenia Gravis crisis resolved in about three months. However, initially, her condition caused some transient limitations with her fine motor skills with her hands and fingers.

16. On September 14, 2018 Plaintiff sent Dr. Johnston an email requesting a temporary accommodation of obtaining two tools to help her manipulate her research samples in the biosafety cabinet as follows: (a) a PCR Strip Cap Tool costing under $50; and, (b) G-Tube Microcentrifuge Tube costing under $50.

17. Within about three and a half hours of this request Dr. Johnston began treating Plaintiff as if he regarded her as disabled by emailing her that "After observing your struggles in the biosafety lab today, I am absolutely convinced that you are not currently able to safely complete the tasks required for the experiments conducted in the lab."

18. Dr. Johnson failed and refused to enter into a good faith dialog with Plaintiff to determine whether his concerns could have been addressed by the inexpensive devices requested as temporary accommodations earlier that day.

19. The issue of whether Plaintiff would be allowed to continue her doctoral studies was eventually addressed by LSUHSC's Graduate Student Affairs Subcommittee.

4

20. The Subcommittee met on October 12, 2018 and spoke with Plaintiff, Dr. Johnston, Alistair J. Ramsay, PhD, Department Head and Professor of Microbiology, Immunology and Parasitology and Dr. Angela Amedee, the Graduate Coordinator of the MIP Graduate Program. Of these, only Dr. Johnston ever observed and had personal knowledge how Plaintiff was manipulating her samples in the biosafety cabinet after her return.

21. During the Subcommittee meeting, Plaintiff explained how the two devices she requested, costing under $50 each (the PCR Strip Cap Tool and the G-Tube Microcentrifuge Tube) would enable her to work with her samples safely in the biosafety cabinet. There were no objections or discussions of any type from the committee of any concerns they could have had as to whether this temporary accommodation would be sufficient to allow Plaintiff to work safely and effectively.

22. Plaintiff made it clear that she wanted a chance to use the requested devices before LSUHSC removed her from her doctoral studies.

23. Because Plaintiff had complained about Dr. Johnston's inappropriate and demeaning reaction to her legitimate accommodation requests, the committee wanted to know if Plaintiff would be willing to go back to Dr. Johnston's lab. Plaintiff replied that there was no reason she could not have returned to the lab.

24. Of the subcommittee members, only Plaintiff, Dr. Amedee and Dr. Johnston had any personal knowledge of Plaintiff's medical condition and the status of her research. There was no independent investigation undertaken by the committee.

5

None of the subcommittee members except Dr. Johnston had any personal knowledge of Plaintiff's her research or her accommodation request.

25. After deliberating out of the presence of Plaintiff, the subcommittee refused to allow Plaintiff even to obtain the inexpensive tools she requested as an accommodation to resolve her fine motor skill limitation or seek any additional information from her treating physician about when her fine motor skills would improve. Plaintiff's symptoms did improve significantly after denied continuing membership in the PhD program.

26. The subcommittee recommended that Plaintiff be awarded a master's degree for the work she had already done. That recommendation was not acted upon.

27. In the end, the subcommittee failed to even mention in its report Plaintiff's requests for reasonable accommodations and summarily, and without discussion, found that Plaintiff "is still not ready to use fine motor skills required to perform the bench work required by her project."

28. Plaintiff was, by this process, forced out of LSUHSC's PhD program on or about October 19, 2018.

VI. **DAMAGES**

29. As a direct and proximate consequence of Defendant's unlawful and discriminatory failure and refusal to accommodate her, Plaintiff has suffered a loss of income including salary and benefits, loss of professional reputation, as well as physical and emotional pain and suffering.

VII. *STATEMENT OF CLAIMS*

30. Plaintiff re-avers and incorporates by reference all of the allegations of paragraphs 1 through 29 herein. In addition, she avers that Defendant's unlawful and discriminatory acts and failure to accommodate her and failure to dialog with her concerning her accommodation requests violates the provisions of the Rehabilitation Act, 29 U.S.C. §§ 701 et seq. justifying an award, inter alia, of back pay, front pay, interest, benefits and compensatory damages.

VIII. *PRAYER FOR RELIEF*

31. WHEREFORE, Plaintiff prays that this Court:

   a) Assume jurisdiction over this action;

   b) Order Defendant to instate Plaintiff with all necessary reasonable accommodations to the position of graduate student in the schools PhD program at the same status that Plaintiff would have attained by date of instatement absent Defendant's discriminatory failure and refusal to permit Plaintiff to participate in the school's doctoral program; or, alternatively, award front pay to Plaintiff for what she would have attained absent Defendant's discriminatory treatment;

   c) Order Defendant to cease and desist from discriminating against students on the basis of the disability, Myasthenia Gravis;

   d) Enter judgment in favor of Plaintiff for such monetary benefits as may be found;

e) Enter judgment in favor of Plaintiff for such amount of compensatory damages for her physical and emotional pain and suffering;

f) Award to Plaintiff all costs, expenses and reasonable attorneys' fees associated with the prosecution of this civil action; and

g) Grant such or alternative relief as appear to the Court to be just and equitable.

Respectfully submitted,

James L. Arruebarrena, Bar # 22235
1010 Common St.
Suite 3000
New Orleans, Louisiana 70112
Telephone: 504-525-2520
Facsimile: 504-814-1498

/s/ Dale E. Williams
Dale E. Williams, Bar # 18709
Law Office of Dale Edward Williams
212 Park Place
Covington, Louisiana 70433
Telephone: (985) 898-6368
Facsimile: (985) 892-2640
mailto:dale@dalelaw.com

## VERIFICATION

Under penalty of perjury, I certify that the foregoing is true and correct to the best of my knowledge and belief.

_____
NATALIA TRAVIS

8